08   CV   6314 CJs

Revised 03/06 WDNY

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

## FORM TO BE USED IN FILING A CIVIL COMPLAINT IN FEDERAL COURT
### (Non-Prisoner Context)

All material filed in this Court is now available via the **INTERNET**.  See **Pro Se Privacy Notice** for further information.

## 1. CAPTION OF ACTION

**A.     Full Name of Plaintiff:  NOTE:** *If more than one plaintiff files this action and seeks in forma pauperis status, **each plaintiff** must submit an in forma pauperis application or the only plaintiff to be considered will be the plaintiff who filed an application.*

Elizabeth L. Gobeli

-vs-

**B.     Full Name(s) of Defendant(s) NOTE:** *Pursuant to Fed.R.Civ.P. 10(a), the names of all parties must appear in the caption. The court may not consider a claim against anyone not identified in this section as a defendant.*  Add a separate sheet, if necessary.

1. Rochester Institute of Technology
2. _____    5. _____
3. _____    6. _____

## 2. STATEMENT OF JURISDICTION, VENUE and NATURE OF SUIT
### *All of these sections MUST be answered*

*Identify the basis for federal Court jurisdiction over your claim, such as that the United States government is a party to the action, all the parties reside in different states and therefore you claim diversity jurisdiction, or the claim presents a federal question or arises under federal law.*

A. Basis of Jurisdiction in Federal Court: Monroe County

*State why the Western District of New York is the proper venue for this action, such as that your claim arises in or the defendant resides in the 17 westernmost counties of New York State.*

B. Reason for Venue in the Western District: My claim arises in and the defendent resides in Monroe County in Western NY.

*Identify the nature of this action, such as that it is a civil rights claim, a personal injury or personal property (tort) claim, a property rights claim, or whatever it is.*

C. Nature of Suit: Civil Rights - discrimination, sexual harrasement American with Disabilities Act, retaliation for brining forward sexual discrimination charges against Department Chair - termination of employment.

### 3. PARTIES TO THIS ACTION

**PLAINTIFF'S INFORMATION** **NOTE:** *To list additional plaintiffs, use this format on another sheet of paper.*

Name of First Plaintiff: *Elizabeth L. Gobeli*

Present Address: *22 James Circle*

*Rochester, New York 14616*

Name of Second Plaintiff: _____

Present Address: _____

**DEFENDANT'S INFORMATION** **NOTE:** *To list additional defendants, use this format on another sheet of paper.*

Name of First Defendant: *Rochester Institute of Technology*

Official Position of Defendant (if relevant): *Office of Legal Affairs*

Address of Defendant: *154 Lomb Memorial Drive*

*Rochester, NY 14623-5608*

Name of Second Defendant: _____

Official Position of Defendant (if relevant): _____

Address of Defendant: _____

Name of Third Defendant: _____

Official Position of Defendant (if relevant): _____

Address of Defendant: _____

### 4. PREVIOUS LAWSUITS IN STATE AND FEDERAL COURT

**A.**     Have you begun any other lawsuits in **state or federal court** dealing with **the same facts involved in this action**?

Yes ✓   No ___ *did not go to court - went through mediation with New York State Human Rights Division*

If Yes, complete the next section. NOTE: *If you have brought more than one lawsuit dealing with the same facts as this action, use this format to describe the other action(s) on another sheet of paper.*

1.     Name(s) of the parties to this other lawsuit:

Plaintiff(s): *Elizabeth L. Gobeli*

Defendant(s): _Rochester Institute of Technology_

2.   Court (if federal court, name the district; if state court, name the county): _Monroe_

3.   Docket or Index Number: _SDHR Case No. 10119777_

4.   Name of Judge to whom case was assigned: _Julia B Day -Regional Director_

5.   The approximate date the action was filed: _____

6.   What was the disposition of the case?

        Is it still pending? Yes_____  No_ ✓_

        If not, give the approximate date it was resolved. _____

        Disposition (check those statements which apply):

        _____ Dismissed (check the statement which indicates why it was dismissed):

            _____ By court *sua sponte* as frivolous, malicious or for failing to state a claim upon which relief can be granted;

            _____ By court for failure to prosecute, pay filing fee or otherwise respond to a court order;

            _____ By court due to your voluntary withdrawal of claim;

        _____ Judgment upon motion or after trial entered for

            _____ plaintiff

            _____ defendant.

## 5. STATEMENT OF CLAIM

**Please note** that it is not enough to just list the ground(s) for your action. You **must** include a statement of the facts which you believe support each of your claims. In other words, just tell the story of what happened and do not use legal jargon.

**Fed.R.Civ.P. 8(a)** states that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." "The function of pleadings under the Federal Rules is to give fair notice of the claim asserted. Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial." Simmons v. Abruzzo, 49 F.3d 83, 86 (2d Cir. 1995).

**Fed.R.Civ.P. 10(b)** states that "[a]ll averments of claim ... shall be made in numbered paragraphs, the contents of each of which shall be limited as far a practicable to a single set of circumstances."

**A. FIRST CLAIM:** On (*date of the incident*) _2003 - 2007_,

defendant (*give the __name and (if relevant) the position held__ of each defendant* involved in this incident) _____

_George Sutherland - Department Chair of the Mechanical 4 Manufacturing Technology Department at Rochester Institute of Technology._

3

did the following to me (*briefly state what each defendant named above did*): Constant sexual harrasment and harrasment for my disability, sexual innuendo's Please see attached sheet for specific remarks made to me and remarks made to others that I was witness to - these remarks and attitutes created a hostile week environment, Constantly made derogatory remarks toward women. Mocked me for my disability.

The federal basis for this claim is: Sexual discrimination, American with Disabilities Act, harrasement

State briefly **exactly** what you want the Court to do for you. *Make no legal arguments and cite no cases or statutes*:

Acknowledge that harrasement and discrimination existed and that termination was a result of bringing forward these charges. And appropriate monetary compensation

**B. SECOND CLAIM:** On (*date of the incident*) May 8, 2007,

defendant (*give the name and (if relevant) position held of each defendant involved in this incident*)
Rochester Institute of Technology

did the following to me (*briefly state what each defendant named above did*): Termination within one month of bringing sexual harrasement discrimination and harrasement of my disability of the Department Chair of the Manufacturing & Mechanical Engineering and Packaging Science Department to the College Dean, Carol Richardson.

The federal basis for this claim is: Fair Labor Practices

State briefly **exactly** what you want the Court to do for you. *Make no legal arguments and cite no cases or statutes*:
Want a letter of recommendation from RIT, I want to my record exsunged from RIT that now reflects I am a forger and a theif, & appropriate monetary compensation. I want my reputation to be restored. I was well respected

If you have additional claims, use the above format to set them out on additional sheets of paper.
within RIT before my termination. And an apology for how they handled my review with the Auditor, my week waiting to hear, and my termination.

4

## 6. SUMMARY OF RELIEF SOUGHT

*Summarize the relief requested by you in each statement of claim above.*

I want the difference in pay from my current
job to what I was making at RIT.
I want to finish the last few courses I have
Remaining for my degree - tuition free as I would
have had had I remained at RIT. Also compensation
for the benefits I lost at RIT - my current job does
not have any benefits except substandard health care.
Damages for Ruining my reputation

Do you want a **jury trial**? Yes  ✓  No _____

**I declare under penalty of perjury that the foregoing is true and correct.**

Executed on ___7/14/08_____
                    (date)

**NOTE:  *Each** plaintiff must sign this complaint and must also sign all subsequent papers filed with the Court.*

_Elizabeth L Gobell_
_____

_____

Signature(s) of Plaintiff(s)

**5. Description of Discrimination**

I was employed by Rochester Institute of Technology from February 2001 through May 8, 2007. I served as Office Manager of the Manufacturing & Mechanical Engineering Technology and Packaging Science Department of the College of Applies Science and Technology from March of 2002 through May 2007. My immediate Supervisor was the Department Chair, George Sutherland, who was an external candidate, serving in that capacity from August 1, 2003 until July 2007. I have attached my job duties and responsibilities (Document A) that included supervising three full time and one part time staff, as well as student workers.

During my time as Office Manager, I was subjected to and witnessed, repeated sexual harassment by Mr. Sutherland who created a hostile work environment through his inappropriate behavior and comments.  His discriminatory comments related to people of color, religious beliefs, females, sexual orientation, and nationalities. I, myself, was harassed for my medical disability and my gender.  Attached is a summary of discriminatory comments (Document B) that I witnessed and shared with the RIT Human Resources Representative, Nancy McDonald-Stoler, who chronicled this information during our first meeting in early April 2007, as part of the formal investigation into the charges against Mr. Sutherland.

The first of two surveys was initiated by the Human Resource Department using an outside vendor and was sent out to all RIT employees. The purpose of this survey was for employees to provide input regarding their immediate supervisors. This survey was done using scan-tron sheets that when completed were mailed back to the outside vendor.  The second survey originated from the College of Applied Science and Technology's (CAST) Dean's Office. This survey was sent to all CAST faculty and staff via e-mail and the response was sent back via e-mail.

On approximately Wednesday, March 21, 2007*, I was called into Mr. Sutherland's office and told that he had received a e-mail from Dean Richardson stating that a faculty member had accused him of sexual harassment of our office staff. Mr. Sutherland wanted to know what I knew about it and requested that I discreetly find out from the office staff who might have " said something". I felt very uncomfortable with the request as I, myself, had experienced inappropriate and lewd comments from Mr. Sutherland, and I knew that other faculty, staff, and students had similar experiences. As a result of that meeting, I made an appointment to meet with Dean Richardson the following morning March 22, 2007* to discuss my concerns.

At first, Dean Richardson said she had not sent an e-mail to Mr. Sutherland regarding sexual harassment charges; and then, later in our meeting, she remembered she had sent him the results of the Dean's Survey via e-mail. I told her about Mr. Sutherland's request and my discomfort in carrying it out. I described his behavior and inappropriate comments, especially considering his position of Department Chair. Then Dean Richardson asked me why I had not taken this to the HR department before. I explained that I did not want to overstep the Dean's Office.

She said she, herself, had heard about comments Mr. Sutherland had made but she was not aware that they were constant or that blatant. I said that I thought that the results of the survey would have triggered the Dean to go to Human Resources to instigate an investigation, but was told that was not the procedure. I asked if there were anything she wanted me to do, including going to HR if needed. She told me that there was nothing I could do. She said that she would meet with Mr. Sutherland and discuss the situation and if things didn't change then further action would be taken.

I was surprised and disappointed at this response because, it contradicted RIT's documented 0% tolerance policy for sexual harassment that I learned during my management training at RIT.  Procedure requires that whenever a manager becomes aware of possible sexual harassment issues in the department, it was the manager's responsibility to bring it to the attention of the Human Resources Department that would begin an investigation of the matter.

I was contacted by Dean Richardson three business days later March 28, 2007* and told that a formal investigation would be conducted by the Human Resource Department and she thanked me for coming forward. The next day March 29, 2007 I was surprised to receive a call from a faculty member who also thanked me for coming forward. I asked him how he knew that I had come forward, and he informed me that the Dean had told him during a casual conversation that day. Although I appreciated his support, I was taught, through my management training at RIT, that information on the identity of informants was strictly confidential.

An investigation did ensue, conducted by the HR Department. I met with the HR representative, Nancy McDonald-Stoler, as did the entire faculty and staff of the department. I sent Nancy additional information by e-mail the next day. Nancy was to schedule another meeting to discuss my concerns about how the information from the investigation was to be presented to Mr. Sutherland. However, when I went for what I thought was the follow-up meeting on May 1, 2007 regarding Mr. Sutherland, two auditors and Nancy McDonald-Stoler were present.

 I was informed that the auditors were doing a random sampling of all the RIT departments' finances and they had a few questions for me. I knew the auditors had met with Mr. Sutherland, Department Chair, since he was the ultimate budget authority for the Department. In fact, Mr. Sutherland had previously informed me of some of his conversation with the auditors, expressing the belief that he had answered all their questions to their satisfaction.

Immediately the meeting became confrontational. The word interrogation would define the manner in which I was treated.  First, I was questioned about using the pro-card for personal purchases. I informed them that I had used the card in error two years previously. At that time, when realizing my error, I immediately deposited the funds into the department account; clearly marked the purchases as personal; and attached the deposit slip on the monthly statement that went to the accounting department, showing I had deposited the funds back into the department account.

Next, I was shown documents where I had clearly signed the Department Chair's name and was asked if I had signed them. I acknowledged signing Mr. Sutherland name as was customary when he was out of the office, informing him upon his return. Mr. Sutherland never told me not to sign his name. In fact, he had suggested having a stamp made with his signature on it.

Next, I was shown a receipt from Wegman's in the amount of $27.00 for a bocce ball set, a badminton set and a crocket set. I was asked what the games were for used for. I explained that they were used during RIT Orientation week when the department hosted the CAST freshman, providing a picnic lunch, activities, and games. I was asked why I had made the purchase in June when the freshman came to RIT in August. I explained we had money left over in the budget for the fiscal year (RIT budget runs from July 1 to June 30) and I anticipated department needs for the upcoming year and purchased ahead. Then I was asked where those games were located. I explained that they were located in our department supply room. I was asked if they were to go there now would they find them. I confirmed this and was told they would have to physically see them immediately after the meeting.

Lastly, I was asked about the Wegman's gift cards we used in the department. I explained we used them throughout the year as student prizes for a variety of competitions and events; such as, orientation, battle bots, pumpkin launching contests, to name a few. I also issued the cards to students who participated in open house panels and to those students who worked in our office, recognizing special holidays and birthdays.

 I also issued Wegman Gift cards to the staff for their birthdays, special holidays and as recognition for services that went over and above their normal job duties.  Other recipients of the cards were the winners of the Department Faculty/Staff Bake-Off contest and the department cleaning staff at Christmas time. I was told that I had used three gift cards and they cited what purchases I made with them.  I said that I had issued cards to myself but not any more than I had issued to other staff. When asked where the gift cards were kept, I informed them that they were located in the locked file cabinet in Mr. Sutherland's office. I was told they would need to physically see them after I showed them the games.

After the meeting, an auditor and the HR representative, Nancy McDonald-Stoler, accompanied me to the supply room to physically see the athletic items. The comment the auditor made was "And there they are".

Following the trip to the storage room, I also showed them the gift cards and the auditor replied "oh yes there are a lot of them".  The auditor, Mr. Sutherland and Nancy McDonald-Stoler met in Mr. Sutherland's Office.  When the auditor left, I was called in and told by the HR Rep that an investigation would be taking place, during which time I would be suspended. She then looked directly at Mr. Sutherland and cited the RIT policy was to suspend with pay, pending the outcome of the investigation.

Ms. McDonald-Stoler told me that the investigation should be complete by that Thursday, May 3rd and I would be informed via mail.  She also mentioned a phone call. I asked for

clarification as to how I would hear, by mail or phone. She said that normally it is done by mail, but she would give me a call. That Thursday, May 3rd, I received a call at 7:00 P.M. from Ms. McDonald-Stoler who informed me that the investigation was not complete but that she was going to push the auditors to complete the investigation by Friday morning, May 4th at 10:00 A.M., after which she would call me. I did not receive a call from her on Friday, May 4th.

I received a Certified letter on Saturday, May 5th (Document E) from the Dean Carol Richardson, stating that the investigation was continuing, so I would remain suspended with pay for up to a week.  It also stated that I would be contacted to discuss the outcome of the investigation.  I heard nothing until late afternoon on Tuesday, May 8, when the Department Chair, Mr. Sutherland, called to inform me that the investigation was complete and that I was terminated. When I asked why I was being terminated, Mr. Sutherland told me it was because I signed his name on documents and that I had issued gift cards to myself. When I responded that I often signed his name with his knowledge, he responded, "Well that was a gray area. It was really the gift cards."

 I was told to report to the Office at 6:00 P.M. that evening to turn in my key, ID, and Pro-Card and remove my belongings. Mr. Sutherland helped me to the car with my personal belongings and told me he was sincerely sorry that this happened. He stated that the decision was not his, as he was just a lowly employee and that the big guys at the top had made the decision. He also said he felt that the whole thing was handled poorly and not correctly.  He wished me luck.

Within 20 minutes of being informed by phone of my termination, I started receiving calls from faculty and staff members responding to the e-mail that Mr. Sutherland had sent notifying everyone that I no longer worked for RIT.  I did not even have time to digest this myself.

After my termination, I did speak with HR Representative, Nancy McDonald-Stoler. I questioned why it was Mr. Sutherland that called me and she said it was the department that did the hiring and the firing, not the HR department. I also said I wanted a copy of the auditors report and she said she would see if she could get one for me. She said there was a 0% tolerance policy for mishandling finances so I asked for a copy of the policy. She stated that it was not a documented policy within RIT Polices and Procedures, but that an e-mail regarding it had been sent out approximately 1½ years ago.

I also asked what recourse I had concerning this matter and was told I could write Patty Spinelli, the head of RIT Human Resources, to inform her of any mitigating circumstances. However, since I had not received any specific information used by RIT to terminate me, (Audit report), I wrote via certified letter (Document F) to Patty Spinelli focusing on the termination letter that called me a " forger".

As of this date, I have had no communication from RIT except for the termination letter (Document G). I have never been contacted to discuss the results of the investigation nor give input into the matter.  When I went to RIT to settle benefit issues, I attempted to meet

with Ms. McDonald-Stoler to obtain a copy of the auditors report as promised. Ms. McDonald-Stoler told the receptionist to tell me I would not be receiving a copy. She did not meet with me. I believe I deserve better treatment based on my loyalty and my performance.

I worked hard during my employment at RIT, establishing a good reputation for personal integrity and highly professional and ethical standards. I did enjoy that reputation with faculty and staff alike. I handled an approximately 4 million-dollar department budget and approximately 1 million dollars in revenue bearing accounts: NSF Grant accounts, gift accounts, scholarship accounts and research accounts. Every year, I stayed within budget by between 96.4% and 99.1% expended. At the time I took over the department finances, the department was $100,000 over their allocated budget for the year. I also worked with the student Min-Baja team to bring their budget within operating limits.

I consistently went over and above my stated job duties by arranging all department events, having students out to my parent's house on Conesus Lake for picnics, taking new faculty to the Social Security Department, and/or the DMV Office, and giving personal tours of the area. Visiting ill and injured students and faculty in the hospital were tasks I undertook because of the loyalty and concern I felt as part of the RIT and CAST families.

I feel my termination from RIT was a direct result of coming forward regarding sexual harassment and creation of a hostile work environment by Mr. Sutherland. Further, it seems that my diagnosis of MS has perhaps provided an opportunity for RIT to rid itself of a potential illness-absence problem in the future.

Mr. Sutherland was relieved of his position as Department Chair, effective July 2, 2007; however, he remains at RIT as a teaching faculty member.

I was greatly distressed by the hostile and unfair treatment I received as is documented by the information presented with this claim. Certainly, there seems to be a direct relationship between Human Rights issues as they relate to Mr. Sutherland.

For a Institute that offers courses and programs in Business Management, Communications, and Ethics—to name a few, it seem that what is preached is not practiced. If this were a practice case used in the classroom, based on the facts and the manner in which it was handled, what would be the consensus as to weather RIT met expected professional and ethical standards?

> \* Dates are reconstructed to the best of my recollection. When I went to the office at 6:00pm on May 8[th] to gather my personal belongings, Mr. Sutherland gave me permission to use my computer. I found, however, that I was unable to log on because my computer account had been locked out. As a result, I was unable to retrieve my resume and related information/documentation.

**Specific remarks and behaviors by Mr. George Sutherland- Document B**

Before he assumed the position of Department Chair he came to Rochester to look for housing. I accompanied Mr. Sutherland on his search. He contacted me often by phone during his long-distance attempt to rent an apartment. On one occasion, because of medical problems that ultimately resulted in a diagnosis of MS, I had had an entire day of testing at Strong. I returned home and was sleeping when he called me at home from Seattle, speaking to my Mother. After being told that I had spent the day under going tests, he insisted that I be awakened.  When I came to the phone, he asked me to revisit some of the apartments to check out the bathroom in one and check the floorboard integrity in another.

While undergoing continued medical testing before my diagnosis of MS, I was called into his office and asked if my problems were psychological.

I often ate lunch at my desk consisting most days of a bowl of soup and a brownie. He repeatedly made comments, such as; "no wonder your sick" and "no wonder you have an exotic disease."

After an attack that left me walking with a cane for a period of time he approached me and asked if I had ever watched the TV show Gun Smoke. I said I had a long time ago and then he said I reminded him of Chester.

During a student Open House, Mr. Sutherland was leading a group of potential students and their families to a room where we were serving lunch. I was walking down the corridor at the time, still with my cane. He declared in a loud voice, after passing me with the group, " Look, he beat you", referring to a student in a motorized wheelchair.

One Monday morning he asked me if I had thought about him during the weekend. I said no. He followed by saying that he thought about me because while on a wine tour he had visited a gift shop where he had seen a jar of chocolate with a brush.  I responded that it would be great to brush on an ear of corn. He responded by reciting the poem that he said was on the jar. The poem was totally sexual in nature. Upset with what I perceived as a most inappropriate, I turned away and did not respond.

He had a fall welcome back party at his house for all faculty and staff. I arranged for the caterer and had to go to his house and set up for the party, while his non-working wife read the newspaper. A few days before the party, he told me his wife would be a little late to the party so I would have to serve as his second wife. During the party, I alone put the food away and did the dishes. He repeatedly came into the kitchen and patted me on the shoulder, saying that I was a good little second wife.

Shared his opinion about the Bill Clinton/ Monica Lewenski affair and said that a man in a high position with all that power is like a buck and that's just what bucks do.

Suggested that I put before the CAST 35 Year Celebration Committee that the Department have Orgy Fridays with a boar roast. Then he said, " No, I mean a hawk roast."

Suggested that we engage in niche marketing to the gay geeks and preceded to prance and skip around with his hands waving in the air.

He told me that one of the staff, a 55-year-old woman, looked like a student from behind.

He made remarks to one of our female student workers so that she felt uncomfortable being left alone with him in the office after the staff left between 4:30pm- 6:00pm. I rescheduled her work hours so that she would only work nights when Mr. Sutherland taught class until 6:00pm.

Asked a faculty member who had ashes on his forehead on Ash Wednesday if this was the time of year that Catholics practice poor hygiene.

Sent an e-mail to all faculty and staff in the department and in the Dean's Office stating that a faculty member would be out for the spring quarter because she was mentally unstable.

Found out a student who was having difficulties with his studies was an AlANA student (A special program offered by RIT for African American students) and stated, "That explains it. All ALANA students are lazy".

Told an Asian student who was having difficulties with his math class stated, "All Asians are good in math and Science, but not you. What happened to you?"

Told two faculty members not to bother speaking with the Development Officer because she was pregnant. He said, "You know, all pregnant women are irrational."

Made disparaging remarks about the interim Dean, Carol Richardson calling her flighty and Associate Dean Linda Tolan, calling her too hostile and aggressive. Never spoke badly about the former Dean, Willy McKenzie (male).

Came out of his office and yelled at a faculty member who was cutting a piece of cake for himself and said, "You aren't having that piece of cake are you? You are rotund already."

Refused, for four years, to acknowledge, in any manner, Administrative Assistants' Day that is a formal way of thanking the staff for their services.

 Did not give stellar reviews for the year 2005 to female faculty and staff, ignoring their contributions for that year.  Several female faculty members came to me, upset with the reviews because no reference had been made to their contributions, thereby minimizing their job performance. I also received less than a stellar review for that year as compared with the previous year. I have enclosed copies of both my 2004-2004 and 2005-2006 reviews (Documents C & D). My 2005 review was written when I returned from an MS

absence. I said that I disagreed with the review, citing that I had accomplished even more than in the previous year. I questioned the reasons for the Proficient rating, considering that your rating on a review should not come as a surprise.  I was met with a blank stare.

Insulted an Alumnus who came to him with an opportunity for students to run a business using his equipment. The Alumnus suggestion was trivialized and rejected.   When Mr. Sutherland tone became hostile, the Alumnus left the office.

 Two of the staff were working out at Curves during their lunch hour. They repeatedly took extended lunch hours. When I confronted them for this, they went to Mr. Sutherland who called a meeting with the three of us. After explaining to us about a card game, he allowed the staff to tell me what they did and didn't like about me, their immediate supervisor. The meeting was hostile and degrading.  He did nothing to stop it or to focus on the issue of extended lunch hours.  Instead, he looked on with an amused expression.  He then left the meeting saying we could handle it from there. After the meeting, he saw I was upset and asked if I was all right.  When I said no, he said, "Now you know how I feel dealing with the faculty. I can't do anything with them either."



**R·I·T**

Rochester Institute of Technology

College of Applied Science and Technology
Office of the Dean
15 Lomb Memorial Drive
Rochester, NY 14623-5603
585-475-2368   Fax 585-475-7080

May 3, 2006

Ms. Elizabeth Gobeli
22 James Circle
Rochester, New York  14616

Dear Beth,

This letter confirms information conveyed to you in a meeting held on Tuesday, May 01, 2006 with George Sutherland and Nancy McDonald-Stoler.  As a result of the need for Internal Audit to complete their investigation, your employment with RIT is thereby suspended with pay effective May 01, 2006, pending the outcome of the investigation.

You will be contacted within the next few days to one week to discuss the outcome of the investigation.

If you have any questions or need assistance during the period of suspension, please contact Nancy McDonald-Stoler at 475-6997.

Sincerely,

Carol Richardson
Interim Dean, College of Applied Science and Technology

Xc: Nancy McDonald-Stoler, Human Resources Services Manager



Rochester Institute of Technology

College of Applied Science and Technology
Office of the Dean
15 Lomb Memorial Drive
Rochester, NY 14623-5603
585-475-2368    Fax 585-475-7080

May 8, 2007

Ms. Elizabeth Gobeli
22 James Circle
Rochester, New York 14616

Dear Beth,

I am writing to inform you that your employment with RIT is terminated, effective May 8, 2007.  Information regarding your benefits will be sent to you under separate cover from Human Resources.

This decision is the result of reviewing the substance of your May 1, 2007 meeting with the representatives of Institute Audit, Compliance and Advisement (IACA) and Nancy McDonald-Stoler, from Human Resources.  During this meeting, you admitted that you forged the department head's signature as approval on the procurement statements as well as taking five student designated gift cards for personal purchases and usage without permission from the department head.

Please be advised that we will pursue restitution of the university funds used to purchase those personal items.

Sincerely,

Carol Richardson
Interim Dean, College of Applied Science and Technology

Xc: Nancy McDonald-Stoler, Human Resources Services Manager

(Document F)

May 13, 2007

Ms. Nancy McDonald-Stoler
Human Resources Service Manager
8Lomb Memorial Drive
Rochester, New York  14623

Dear Nancy,

This communication addresses your letter of May 08, 2007, as it falsely attributes statements that I allegedly made during our meeting of May 1, 2007.  Specifically:

...you admitted that you forged the department head's signature...

The actual information I provided at that meeting is as follows:
1. When George was away, I routinely signed his name, adding my initials, to expedite office business.  He was always made aware of these matters upon his return.
2. During the four years, George never directly stated nor implied that such a practice was unacceptable.
3. Such a practice is a reasonable expectation of an Office Manager who handles office matters in the supervisor's absence.

To question this practice after four years and then use the word "forged" to summarize this charge against me is of great concern to my family and me.  It is not merely a matter of semantics, but also a matter of ethics to label my actions in such a manner.  The fact, that this issue was even cited suggests an agenda that goes beyond a routine audit.

Please note the denotations and connotations of the word to further clarify the matter:

The definition of the word "FORGE", according to the Synonym Finder, J.I. Rodale:
(ALL USUAL OF HANDWRITING; FRAUDULENTLY) IMITATE, COPY, REPRODUCE, SIMULATE, DUPLICATE, REPLICATE, MIMIC, APE, FALSIFY, ALTER, MODIFY.
(ALL IN REFERENCE TO HANDWRITING; ALL FRAUDULENT) ALTERATION, MODIFICATION, SIMULAION, IMITATION, COPYING, REPRODUCTION, DUPLICATION, REPLICATION.

It is necessary to address this matter, so that no document used for my dismissal reflects the criminal act of forgery, and that my statements are accurately reported, and that no conclusions are drawn not merited by my statements.

As we discussed, I am waiting for the official Auditors' Report.  At that time, I will have the necessary information to prepare a response that you explained was my opportunity for a case review.

Yours truly,

Beth Gobeli

Cc: Carol Richardson, Interim Dean, College of Applied Science and Technology

# R·I·T

**Rochester Institute of Technology**

Office of Legal Affairs
Finance and Administration Division
154 Lomb Memorial Drive
Rochester, NY 14623-5608
585-475-6932  Fax 585-475-2323

September 4, 2007

Julia B. Day
Regional Director
NYS Division of Human Rights
One Monroe Square
259 Monroe Avenue, Suite 308
Rochester, New York 14607

          Re:    Elizabeth L. Gobeli v. Rochester Institute of Technology
                   SDHR Case No. 10119777

Dear Ms. Day:

      This position statement is submitted on behalf of Respondent Rochester Institute of Technology (hereinafter "RIT"). On August 22, 2007, RIT received a Verified Complaint filed against it by Complainant Elizabeth L. Gobeli. (A copy of the Verified Complaint is attached hereto as Exhibit "A"). In that Complaint, Gobeli alleges discrimination based on disability and sex while employed as an Office Manager for the Manufacturing & Mechanical Engineering Technology and Packaging Services Department (hereinafter "MMET/PS"). MMET/PS is a Department within the College of Applied Science and Technology (hereinafter "CAST"). Gobeli also alleges that she was terminated in retaliation for her complaint of sexual harassment against the Department Chair of MMET/PS at the time, Mr. George Sutherland. (Verified Complaint ¶ 3).

      Gobeli began her employment with RIT on February 19, 2001 as a Staff Assistant in the English Language Arts Center. She transferred to MMET/PS on March 14, 2002 where she assumed the position of Senior Staff Assistant. An MMET/PS Senior Staff Assistant is responsible for providing administrative, financial, human resource and student support. The Senior Staff Assistant supervises office employees and student workers and works closely with the Department Chair of MMET/PS. (A copy of the Senior Staff Assistant Job Description is attached hereto as Exhibit "B").

      In her Complaint, Gobeli alleges that she "was subjected to and witnessed, repeated sexual harassment by Mr. Sutherland who created a hostile work environment through his inappropriate behavior and comments." (Verified Complaint ¶ 5). She outlines various instances of these alleged behaviors and comments in an attachment to

her Complaint. (Verified Complaint Exhibit B). Gobeli claims that she shared these instances of sexual harassment with the RIT Human Resources Department in April, 2007.

RIT denies that Gobeli was terminated in violation of any applicable law including, but not limited to, the N.Y. Human Rights Law, Title VII of the Civil Rights Act of 1964 and the Americans With Disabilities Act. Gobeli was terminated for violating RIT's Procurement Card policies, signing Mr. Sutherland's name to financial reimbursement forms, and helping herself to items purchased with RIT funds and intended for official RIT business.

RIT's Procurement Card is a Chase Visa Card that is provided to certain RIT employees for use when purchasing business related goods (hereinafter "P-Card"). Although the P-Card is issued in the name of the employee, all P-Card charges are automatically paid by RIT. As a result, RIT's policy with respect to the P-Card is that no personal charges are to be made. (A copy of the RIT P-Card Policy is attached hereto as Exhibit "C"). P-Card statements are routinely reviewed and audited by appropriate RIT departments in order to ensure compliance with this policy. As a result of a routine review of monthly P-Card statements, Gobeli's usage of the P-Card was identified and forwarded to RIT's Institute Audit, Compliance and Advisement department (hereinafter "IACA") for further investigation in July 2006.

IACA commenced its audit and investigation of Gobeli's usage of her P-Card on or about March 2007. This investigation revealed multiple purchases of Wegmans Gift Cards, other suspected personal charges by Gobeli, and several instances of forged signatures on Monthly P-Card Statement Certification forms. Monthly P-Card Statement Certification forms are provided to P-Card holders, must be signed by the P-Card holders' supervisor, and contain a certification that the purchases made with the P-Card that month were for official RIT business. (A copy of the Monthly P-Card Statement Certification forms with the forged signature of George Sutherland is attached hereto as Exhibit "D").

As a result of the IACA investigation, Gobeli was interviewed on or about May, 2007. During this interview, Gobeli admitted to signing Mr. Sutherland's signature on Monthly P-Card Statement Certification forms, and to taking, without permission, Wegmans Gift Cards purchased by MMET/PS. These admissions are violations of RIT Policy. IACA's investigation revealed that Gobeli used the P-Card for personal use and that she also used the Wegmans Gift Cards to purchase, among other items, cigarettes and food. It was this investigation, coupled with the admissions made by Gobeli, that led to her termination from the position of Senior Staff Assistant with MMET/PS.

Gobeli infers in her Complaint that she was unaware of RIT policies regarding the appropriate use of her P-Card. In April and May, 2006, letters were sent to P-Card holders and their supervisors advising them of RIT's policy with respect to the appropriate usage of the P-Card. (Copies of these letters are attached hereto as Exhibit

"E"). These letters clearly state that RIT will "not tolerate" employees using procurement cards for personal use.

Gobeli's complaints about Mr. Sutherland's behavior were not brought to the attention of the Dean of CAST or RIT's Human Resources Department until after misuse of the P-Card was identified through routine monthly reviews and audits.  In fact, by her own admission, her first complaint to the Human Resources Department was not until April of 2007 (Verified Complaint ¶ 5).  This was eight months after her P-Card usage was identified for further investigation and one month after she became the subject of an IACA audit and investigation. Given this timeline, Gobeli's termination could not have been in retaliation of her complaints of Mr. Sutherland's behavior.

Mr. Sutherland's behavior was the subject of a separate investigation.  This investigation revealed violations of RIT Policies and Procedures and led to his discipline, which included removal as the Department Chair of MMET/PS.  In light of these facts, as outlined in this Position Statement, RIT respectfully requests that Gobeli's Complaint be dismissed.

Should you require any additional information, please do not hesitate to call or write.

Very truly yours,

ROBERT A. COLÓN
Chief Legal Officer

RAC:mes
Enclosures

September 14, 2007


Julia B. Day
Regional Director
NYS Division of Human Rights
One Monroe Square
259 Monroe Avenue, Suite 308
Rochester, New York  14607

      Re:    Elizabeth L. Gobeli v. Rochester Institute of Technology
              SDHR Case No. 10119777

Dear Ms. Day,

The following is my written rebuttal to Rochester Institute of Technology's (RIT) written position statement dated September 4, 2007 to my complaint filed with the New York State Division of Human Rights, case No. 10119777.

In paragraph 2, a copy of the Senior Staff Assistant position was attached hereto Exhibit "B". In Exhibit "B" provided by RIT please note that the title reads Job Posting. The job description provided in my original complaint documentation "Document A" was the actual job description for my position as Office Manager of the Manufacturing and Mechanical Engineering and Packaging Science Department. "Document A" was the job description officially recognized and filed with the College of Applied Science and Technology's Dean's Office. The job posting provided as "Exhibit B", I assume, is a generic description used to advertise positions for Senior Staff Assistants.

In paragraph 4, RIT contends that I was terminated as a result of violating RIT's procurement card policies (P-card), signing Mr. Sutherland's name to financial reimbursement forms, and helping myself to items purchased with RIT's funds and intended for official RIT business. I will address each point as presented.

## 1. Violating RIT's P-Card policies.

RIT's position statement has placed great emphasis on my violating RIT's P-Card policies. It is noteworthy that there was no reference to the P-Card abuse in my termination letter (Document G).   Neither did Mr. Sutherland mention it when he called to inform me of my termination although  I asked him the reasons I was being terminated. This is addressed in paragraph 19, page 4 of my original complaint that stated:

*...I heard nothing until late afternoon on Tuesday, May 8, when the Department Chair, Mr. Sutherland, called to inform me that the investigation was complete and that I was terminated. When I asked why I was being terminated, Mr. Sutherland told me it was because I signed his name on documents and that I had issued gift cards to*

*myself. When I responded that I often signed his name with his knowledge, he responded, "Well that was a gray area. It was really the gift cards."*

Likewise, Nancy McDonald-Stoler from RIT's Human Resource Department did not mention it when I spoke with her via telephone and discussed the reasons for my termination. The only time the P-Card was mentioned by the auditors occurred during the one and only meeting we had. I initially was lead to believe that the meeting called by Nancy McDonald-Stoler was held to discuss harassment by Mr. Sutherland.

In fact, I discussed the P-Card issue when giving my narrative in my Human Rights complaint. Specifically, from paragraph 11, page 2 of my original complaint that stated:

*...Immediately the meeting became confrontational. The word interrogation would define the manner in which I was treated. First, I was questioned about using the pro-card for personal purchases. I informed them that I had used the card in error two years previously. At that time, when realizing my error, I immediately deposited the funds into the department account; clearly marked the purchases as personal; and attached the deposit slip on the monthly statement that went to the accounting department, showing I had deposited the funds back into the department account.*

In "Exhibit F", from RIT is two letters that were sent to P-Card holders and supervisors. I do not recall seeing the letter dated April 3, 2006, but I do recall seeing the letter dated May 26, 2006. In paragragh two of that letter it states:

*... We have reviewed several inadvertent purchases made in the system that were recognized by the employee and immediately corrected with the assistance of their supervisor. We understand this may occur.*

My question: How many RIT P-Card holders who have ever used the P-Card in error after immediately correcting the mistake was terminated? I know that Deanna Jacobs, a faculty member who is the Program Chair for the Packaging Executive Leader Program took my card for the weekend to charge items for her program and inadvertently used the card in error. She immediately wrote a check and I deposited it into the department account. Likewise, Ti-Lin Liu a long time faculty member also used the P-Card to purchase airline tickets and reimbursed the department immediately.

Please also note that the errors I made were done prior to the letter of May 26, 2006. On only two occasions I made the mistake of using the wrong charge card. Both times I corrected the situation in a timely fashion according to the common practice throughout the Institute.

It is also interesting to note that my P-Card usage was sent to RIT's Institute Audit, Compliance and Advisement department in July of 2006 and that the audit occurred in March of 2007 on or about the same time I brought forth charges against Mr. Sutherland.

### 2. Multiple Purchases of Wegmans Gift Cards

First, the purchase of multiple Wegmans Gift cards was a yearly-authorized purchase by the Department Chair, George Sutherland. As we approached the end of the fiscal year (June 30) it was department practice to purchase items we knew we would use in the following year. The Wegmans gift cards were such a purchase. As in my original complaint paragraph 14, page 3 that stated:

*...Lastly, I was asked about the Wegman's gift cards we used in the department. I explained we used them throughout the year as student prizes for a variety of competitions and events; such as, orientation, battle bots, pumpkin launching contests, to name a few. I also issued the cards to students who participated in open house panels and to those students who worked in our office, recognizing special holidays and birthdays.*

*I also issued Wegmans Gift cards to the staff for their birthdays, special holidays and as recognition for services that went over and above their normal job duties. Other recipients of the cards were the winners of the Department Faculty/Staff Bake-Off contest and the department cleaning staff at Christmas time. I was told that I had used three gift cards and they cited what purchases I made with them. I said that I had issued cards to myself but not any more than I had issued to other staff. When asked where the gift cards were kept, I informed them that they were located in the locked file cabinet in Mr. Sutherland's office. I was told they would need to physically see them.*

It should also be noted that the College of Applied Science and Technology provided recognition throughout the year to staff until 2005. Prior to 2005 the staff was treated to a fall steak roast, a Christmas-time luncheon and a gift and a spring CAST BASH luncheon, as well as Wegmans gift cards. After these practices stopped in 2005, it was left to the department to recognize staff throughout the year. I recognized the staff including myself, with Wegmans Gift cards. Mr. Sutherland understood and affirmed the benefits of the gift cards on the moral of the faculty and staff. My efforts to facilitate a friendly and cooperative environment became more important as the effects of the harassment and hostile work environment impacted on the department.

RIT's letter also states the purchases I made with the gift cards, cigarettes and food. (The relevancy of what I purchased is not clear.) Did RIT also investigate the purchases made by other staff with their gift cards?

### 3. Other suspected personal purchases by Gobeli

I would like to know what other suspected personal purchases I made with the RIT P-Card. If they are referring to the bocce ball set, badminton set and crocket set the auditors questioned me about I addressed that issue in paragraph 13 and 16, page 3 of my original complaint that stated:

*...Next, I was shown a receipt from Wegman's in the amount of $27.00 for a bocce ball set, a badminton set and a crocket set. I was asked what the games were for used*

*for. I explained that they were used during RIT Orientation week when the department hosted the CAST freshman, providing a picnic lunch, activities, and games. I was asked why I had made the purchase in June when the freshman came to RIT in August. I explained we had money left over in the budget for the fiscal year (RIT budget runs from July 1 to June 30) and I anticipated department needs for the upcoming year and purchased ahead. Then I was asked where those games were located. I explained that they were located in our department supply room. I was asked if they were to go there now would they find them. I confirmed this and was told they would have to physically see them immediately after the meeting.*

*...After the meeting, an auditor and the HR representative, Nancy McDonald-Stoler, accompanied me to the supply room to physically see the athletic items. The comment the auditor made was "And there they are".*

**4.  Forged signatures of the department Chair on monthly P-Card statements.**
I have also addressed this in my original complaint paragraph 12, page 3 that stated:

*...Next, I was shown documents where I had clearly signed the Department Chair's name and was asked if I had signed them. I acknowledged signing Mr. Sutherland name as was customary when he was out of the office, informing him upon his return. Mr. Sutherland never told me not to sign his name. In fact, he had suggested having a stamp made with his signature on it.*

Please compare the signature of George Sutherland on the Performance Appraisals I attached as Documents C & D with the documents that RIT provided. It is clearly not a forgery.

**5.  Infers that I was unaware of the P-Card policies.**
Again I addressed this in my original complaint paragraph 22, page 4 that stated:

*After my termination, I did speak with HR Representative, Nancy McDonald-Stoler. I questioned why it was Mr. Sutherland that called me and she said it was the department that did the hiring and the firing, not the HR department. I also said I wanted a copy of the auditors report and she said she would see if she could get one for me. She said there was a 0% tolerance policy for mishandling finances so I asked for a copy of the policy. She stated that it was not a documented policy within RIT Polices and Procedures, but that an e-mail regarding it had been sent out approximately 1½ years ago.*

**6.  First complaint to HR was not until April 2007 eight months after P-Card use identified for investigation.**

<u>**HR was aware of the issues with Mr. Sutherland**</u> prior to my coming forward in March of 2007 based on the results of the HR survey conducted on or about late fall 2006, early winter 2007. In the survey I cited my concerns about Mr. Sutherland.

Confidential                                          Page 4

In my original complaint paragraph 3, page 1 that stated:

*...The first of two surveys was initiated by the Human Resource Department using an outside vendor and was sent out to all RIT employees. The purpose of this survey was for employees to provide input regarding their immediate supervisors. This survey was done using scan-tron sheets that when completed were mailed back to the outside vendor. The second survey originated from the College of Applied Science and Technology's (CAST) Dean's Office. This survey was sent to all CAST faculty and staff via e-mail and the response was sent back via e-mail.*

My complaint was **made for the first time verbally** to the Dean of the College, Carol Richardson in March of 2007. I did not meet with HR until the first week in April 2007.

The auditors met with Mr. Sutherland in March 2007 and in paragraph 10, page 2 of my original complaint it stated:

*...I knew the auditors had met with Mr. Sutherland, Department Chair, since he was the ultimate budget authority for the Department. In fact, Mr. Sutherland had previously informed me of some of his conversation with the auditors, expressing the belief that he had answered all their questions to their satisfaction.*

I was totally unaware that I was the subject of an investigation conducted by Internal Audit.

If RIT was so concerned with P-Card misuse why did they wait eight months to investigate? And if they were satisfied with the answers provided by Mr. Sutherland as to purchases on the P-Card, why did the investigation continue and then focus on me? And why did it take longer than the two days I was originally told it would take for the investigation?

If indeed, the investigation was ongoing for eight months, why during all that time did Mr. Sutherland continue his practice of accepting my signing his name to documents? And certainly he was aware of the gift cards that were kept in his office and dispensed to the faculty and staff.

I have cited the efforts I made over the years to provide services to the students, faculty, and staff that enhanced the image of RIT. Nothing in the records or, I believe, the perceptions of the faculty, staff and students would suggest that my actions contradicted this.

Lastly, it is disheartening to know that Mr. Sutherland who is still employed and teaching at RIT was only disciplined for violating RIT's Policies and Procedures and RIT's published 0% Tolerance Policy of Sexual Harassment. This was not Mr. Sutherland first offense. He had sent an e-mail to all faculty, staff of the department and Dean's Office stating that a female faculty member would not be teaching in the spring quarter due to mental instability (violation of Federal Privacy Laws).

RIT believes that this complaint should be dismissed; I believe that the facts warrant further investigation by the Human Rights Department. I continue to believe that my termination was the result of coming forward with sexual harassment charges and my diagnosed condition of MS that could have had a future impact on my attendance. I cited this in Document B, paragraph page 2and 3 that stated:

*...Did not give stellar reviews for the year 2005 to female faculty and staff, ignoring their contributions for that year. Several female faculty members came to me, upset with the reviews because no reference had been made to their contributions, thereby minimizing their job performance. I also received less than a stellar review for that year as compared with the previous year. I have enclosed copies of both my 2004-2004 and 2005-2006 reviews (Documents C & D). My 2005 review was written when I returned from an MS absence. I said that I disagreed with the review, citing that I had accomplished even more than in the previous year. I questioned the reasons for the Proficient rating, considering that your rating on a review should not come as a surprise. I was met with a blank stare.*

The manner in which I was interrogated, and the scenario that followed clearly shows a lack of respect, common courtesy and compassion:

1. The fact I was subjected to and witnessed prolonged harassment and worked in a hostile work environment.
2. Required to report to Mr. Sutherland, the very person who was the subject of my harassment complaint, to clear out my desk.
3. Failure of HR to follow through on providing me with documentation, specifically the Auditors' report.
4. Refusal of HR to meet with me to discuss the matter.
5. The fact that I had to settle for a short, vague and inaccurate termination letter from the Institute that affected my livelihood as a 50-year-old worker with a major disability.

Sincerely,

*Beth Gobeli*

Beth Gobeli

NEW YORK STATE
DIVISION OF HUMAN RIGHTS

---

NEW YORK STATE DIVISION OF
HUMAN RIGHTS on the Complaint of

ELIZABETH L. GOBELI,

Complainant,

v.

ROCHESTER INSTITUTE OF TECHNOLOGY,

Respondent.

DETERMINATION AND
ORDER AFTER
INVESTIGATION

Case No.
10119777

---

Federal Charge No. 16GA704667

On 8/21/2007, Elizabeth L. Gobeli filed a verified complaint with the New York State Division of Human Rights ("Division") charging the above-named respondent with an unlawful discriminatory practice relating to employment because of disability, sex, opposed discrimination/retaliation in violation of N.Y. Exec. Law, art. 15 (Human Rights Law).

After investigation, and following opportunity for review of related information and evidence by the named parties, the Division has determined that there is NO PROBABLE CAUSE to believe that the respondent has engaged in or is engaging in the unlawful discriminatory practice complained of. This determination is based on the following:

The investigation revealed insufficient evidence to support the allegations of the compliant. There is no evidence that the complainant was subjected to any adverse employment action based on her disability. The evidence does not show that the complainant was subjected to unwanted sexual attention that was so severe or pervasive as to create a hostile work environment. Further, the evidence shows that once Mr. Sutherland's conduct was brought to the respondent's attention, it immediately investigated the allegations of misconduct and demoted Mr. Sutherland as a result of its findings. Although the parties both indicated that other employees complained of Mr. Sutherland's conduct and participated in the respondent's investigation by providing information about Mr. Sutherland's offensive conduct, none of the complainant's coworkers were terminated. The investigation did not reveal evidence that any

other employee had violated the respondent's procurement card usage policy without being terminated.

The complaint is therefore ordered dismissed and the file is closed.

PLEASE TAKE NOTICE that any party to this proceeding may appeal this Determination to the New York State Supreme Court in the County wherein the alleged unlawful discriminatory practice took place by filing directly with such court a Notice of Petition and Petition within sixty (60) days after service of this Determination. A copy of this Notice and Petition must also be served on all parties including General Counsel, State Division of Human Rights, One Fordham Plaza, 4th Floor, Bronx, New York 10458. DO NOT FILE THE ORIGINAL NOTICE AND PETITION WITH THE STATE DIVISION OF HUMAN RIGHTS.

Your charge was also filed under Title VII of the Civil Rights Act of 1964. Your charge was also filed under the Americans with Disabilities Act (ADA). Enforcement of the aforementioned law(s) is the responsibility of the U.S. Equal Employment Opportunity Commission (EEOC). You have the right to request a review by EEOC of this action. To secure review, you must request it in writing, within 15 days of your receipt of this letter, by writing to EEOC, New York District Office, 33 Whitehall Street, 5th Floor, New York, New York 10004-2112. Otherwise, EEOC will generally adopt our action in your case.

Dated:   FEB 1 4 2008
        Rochester, New York

                    STATE DIVISION OF HUMAN RIGHTS


          By:  *Julia B. Day*
               Julia B. Day
               Regional Director

- 2 -

March 4, 2007


U.S. Equal Employment Opportunity Commission (EEOC)
New York District Office
33 Whitehall Street, 5th Flr.
New York, New York   10004-2112
Federal Charge No.   16GA704667
Case No. 10119777


Dear Reviewer,

On 8/21/2007, I, Elizabeth Gobeli, filed a verified complaint with the New York State Division
of Human Rights charging Rochester Institute of Technology with an unlawful discriminatory
practice relating to employment because of disability, sex, and discrimination/retaliation in
violation of N.Y. Exec. Law, art. 15   (Human Rights Law).  My charge was also filed under
TitleVII of the Civil Rights Act of 1964 and the Americans with Disabilities Act (ADA).

On February 20th I received a Determination and Order after Investigation from the New York
State Division of Human Rights. The Division determined that there was no probable cause to
believe that Rochester Institute of Technology has engaged in or is engaging in the unlawful
discriminatory practice complained of.

I strongly disagree with the findings of the New York State Division of Human Rights and am
formally requesting a review of this action by the EEOC.

I was subjected to inappropriate sexual and sexist remarks and harassed for my disability by the
Department Chair (my supervisor). I also witnessed discriminatory remarks against others. I
came forward about this inappropriate behavior to the Dean of the College and I was terminated
within a month.  Every member of the Manufacturing & Mechanical Engineering Technology
and Packaging Science Department was interviewed by Rochester Institute of Technology's
Human Resource Department. The Department Chair was relieved of his position but remains
employed at RIT as a full time Professor, despite an RIT published 0% policy regarding sexual
harassment, discrimination and creating a hostile work environment.

I am working under the assumption that the EEOC is in possession of a copy of all the
documentation relating to this case; my initial complaint, Rochester Institute of Technology's
response and my rebuttal. I will expeditiously supply any documentation that you are missing.

Thank you for your time and consideration. I look forward to hearing from you.

Sincerely,

*Elizabeth Gobeli*

Elizabeth Gobeli

EEOC Form 161 (2/08)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: | Elizabeth L. Gobeli<br>22 James Circle<br>Rochester, NY 14616 | From: | New York District Office<br>33 Whitehall Street<br>5th Floor<br>New York, NY 10004 |
|---|---|---|---|

| | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR §1601.7(a)) | |

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 16G-2007-04667 | Holly M. Woodyard,<br>Investigator | (212) 336-3643 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[ ] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[X] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other (briefly state)

### - NOTICE OF SUIT RIGHTS -

(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt **of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

_____   4/14/08

Spencer H. Lewis, Jr.,
Director                          (Date Mailed)

Enclosures(s)

cc:   **ROCHESTER INSTITUTE OF TECHNOLOGY**
      **154 Lomb Memorial Driv**
      **Rochester, NY 14623**
      **Attn: Robert A. Colon**